Good morning. May it please the court. My name is Spencer Freeman. I represent the appellant Wilco, Ltd. I would like to reserve three minutes for a rebuttal argument and also good morning Mr. Freywitzer. There's two main focal points of this case and they're both found within the purposeful direction analysis pursuant to the due process requirements for personal jurisdiction over foreign defendants, specifically express aiming and harm in the forum. Now this case comes sort of on the heels of AMA Multimedia v. Lenat, which was decided by this court in 2020, where the express aiming was found to be lacking specific to a website. Both the district court here and the appellees here rely really heavily on the AMA analysis, but such reliance really requires that interpretation of AMA to conflict with other precedents of this of a website in the forum alone cannot confer jurisdiction into the forum. This court's discernment has determined that that display along with quote something more can confer jurisdiction. The common theme of that something more is that there's something about the website that shows annoying exploitation of the forum market. For instance, in Mavericks, the court did not have any information regarding the actual users of the websites. The court looked to the matter, the photos that were specific to some California celebrities, the fact that there was some California advertisements and inferred at that point that there was a significant California users of the website. And thus, the operators of the website were exploiting the California market. Similarly, in ILA, which was more recently decided by this court, there was distribution channels based off of the products ordered off of a website in the United States that made delivery of those products easier in the United States and faster United States. And there was advertisements that was specific to a US viewer. Similarly here, the aggregate of the facts show that there's something more that the operators of the website thisav.com were desiring and intending to exploit the US market. First of all, this is a Japanese website. And it's almost all in Japanese except for the operational forms of the website. Those things that essentially establish the rules of the website. Those are all in English, including the privacy page, the DMCA page, and the 2257 page, which are all three really specific and only relevant to a US user. In fact, when you look at the privacy page on there, it says thisav.com is a website available from its location in the United States of America. We at thisav.com do not warrant or make any discretion about its appropriate use and availability outside of the aforementioned country. The operators, the owners and operators of the site specifically say this site is meant for the United States. Then in furtherance of that, the site then cites the... I'm sorry, was there a question? No, okay. The site then cites the DMCA, the Digital Millennium Copyright Act, and outlines the procedures that the site will go through to comply with the DMCA. By doing that, they are seeking protections of safe harbor provisions available underneath the Digital Millennium Copyright Act. Then the 2257 page specifically references United States Code, 18 U.S.C. 2257, and avers that the site is in compliance with 2257. Now the... So counsel, the defendant argues here that the privacy page, that this was just simply an accident, something left over from a template and it doesn't really mean anything. I'm going to ask your friend where the evidentiary support is for that allegation, but what I want to ask you is if there is evidentiary support for it, does it matter whether somehow subjectively somebody made a mistake in putting this on the website from a template? So, and I think there's a... I'm going to answer that in kind of in two parts. When you go back and look at the record, specifically ER 113, which is the declaration from this AV owner or representative, your question was specific to the privacy page, but paragraphs 31 and 32 of the record of that declaration specifically references the DMCA page and the 2257 page. It doesn't talk about the privacy page at all. The argument you're talking about, that the language that I just read off that privacy page, that was argument of counsel. There's nothing in the record specific to that, but more importantly, when you look at these pages in themselves, when I reference those three pages, 31 times on those three pages, thisav.com is referenced and that's not done through a find and replace function because it's inconsistent. Sometimes AV is capitalized, sometimes it's not. Sometimes it's used with .com, sometimes it's not, and sometimes it's misspelled. Somebody went through here and hand put in thisav or thisav.com. That means that they know of this language. They altered the language for their purpose. They should be held account to the language. Now, but your question, however, for me was if it was a mistake, should it matter? My response to that is essentially no, because you still have information on this website that is geared towards the United States. So if somebody's on here or they're doing a search and they find this as a result of those terms, they're stuck with it. It still shows that it's meant for or it's geared for the United States, even if it's there by accident. But here, I think the circumstantial evidence shows it's not here by accident. It was here on purpose. And it makes sense that it was because the operators of the site also entered into U.S. contracts with U.S. companies. One very key one is contract to have the website hosted on servers here in the United States, and it is. The entire website is housed here. It's displayed to all users from here, including those users in the United States. It does distinguish it from AMA. It does distinguish it from AMA because the servers in the AMA case were overseas. Now, they did in AMA use a DNS server, but the DNS server is a domain name server. And that's not something that is in, at least in my mind, that really shows an intent to deliver to a certain locale as opposed to the host servers here, but also in combination with the CDN servers, the content delivery network servers, which the fact that the CloudFlare CDN servers here use cached edge delivery is specific to wanting to make sure that you can stream a video efficiently, quickly, without interruption to local users, users local to that server. The DNS server in AMA, that's not what it did, but all it did was it used, it linked the name of the website with the IP protocol. So when somebody went online and typed in the URL, the domain name, it actually brought the user to that website. That's the function of the DNS server as opposed to hosts actually hosting and then the CDN as well. So I think that's a pretty major distinction from AMA. Also here, they registered with GoDaddy. They utilized the .com rather than something that's more in line with an Asian market. And then we get to the geotargeted ads. Those geotargeted ads, they're somewhat similar to AMA, but I think there's a distinction. The court in AMA looked at those geotargeted ads and said, across the world, it doesn't matter where you are, you're going to get an ad that's specific to you. We don't know that here. What we know here is that it's targeted to the United States. I don't know if in the Congo or the Republic of Seychelles, you're going to get ads delivered there. And I'm at two minutes, so I'd like to reserve my time. Thank you. All right. Thank you, counsel. Mr. Frey-Witzer. Good afternoon. May it please the court. My name is Evan Frey-Witzer and I represent the appellees Ka Young Lee and Yuhaha Marketing and Promotion Limited doing business as ThisAV.com. Your honors, this is a case in which the plaintiff, a Japanese limited liability company headquartered in Tokyo, brought an action against a Hong Kong born individual who is a permanent resident of Hong Kong and a Hong Kong company concerning a website that is viewed almost entirely by viewers from Japan, Taiwan and Hong Kong. It is a Japanese language website that displays user generated videos with Japanese titles and videos that are primarily in the Japanese language. The website, which is operated and maintained entirely from Hong Kong, is supported entirely by third party ads placed on the website by ad brokers who are located in Canada, Costa Rica and Spain. The agreements with those ad brokers were all entered into from Hong Kong. The plaintiff alleges in its complaint that 13 of its videos appeared on the website, a website that hosts more than 221,000 unique videos, having been uploaded to the site by third party users of the website, allegedly without the plaintiff's permission. In other words, your honors, the videos at issue in this case represented 0.006% of all of the videos appearing on the website. Is that what we look at? Or in this prong of purposeful direction, don't we look at in general what the connections are to the United States, not just plaintiff's videos? Don't we look at the number of users, the number of videos from the United States, etc. Isn't plaintiff's users only a part of that? It is only a part of it, your honor, but it is a part of it. And indeed, I think one of the things that is relevant to the question presented is to what extent can plaintiff claim that harm to the plaintiff was foreseeable within the forum. And when the plaintiff's videos at issue represent 0.06, I'm sorry, 0.006% of the total videos that appear at the website, I think there's a question not only about foreseeability of harm within the forum, but whether there was actual jurisdictional harm within the forum. I think, your honors, that the court's... How many numerically that percentage represents? Your honor, I did do the math this morning. And if one were to assume that every video is equally viewed, every one of the 221,000 videos on the website got an equal number of views, that would suggest that about 78 times plaintiff's videos in total, the 13 videos in total were viewed 78 times over the course of a year. I'd like to start by talking about the Walnut case because if the decision in Walnut is honored here, the district court's decision must be affirmed because the facts of the Walnut presented a much more compelling case for an exercise of personal jurisdiction. But the facts there certainly didn't have, for example, the privacy page which told the users this av.com is a website available from its location in the United States, etc. There was nothing like that in that case, right? Correct. That is largely correct, your honor. And so let me address the issue that you're raising about the language on the website. And you had asked my brother about it as well. It's undisputed, and it was undisputed below that this was boilerplate language that was placed on the website. Tell me where in the record that is. I've looked to your citations at ER or SCR, whichever it is, 113, and I'm looking at the declaration of Mr. Tam. I don't see it there. I do not see that this posting from the privacy page is boilerplate left over, but you can point me to where you think that is in the record if I'm looking at the wrong page. I think you're starting in the correct place, your honor, with ER 113, but I think you should also direct your attention to pages ER 36 through ER 39. And part of what should give the court some comfort that this language was mistakenly included on the webpage is that quite honestly, and somewhat embarrassingly for the client, the terms and conditions are a complete mess. There are references not only to this av.com, but avhere.com, which is another website which has no connection whatsoever to the defendants here. It's clearly left over from someone else's form. There's a whole discussion about how the website is governed by the laws of Panama, and all disputes concerning the use of the website are subject to the exclusive jurisdiction of the Republic of Panama. And despite the plaintiff's unfounded speculation in its briefs that this was somehow intentional, the sworn testimony before the court, and again, this is at ER 36 through ER 39, is that the defendants have no connection whatsoever to Panama, never intended to be. Was there any sworn testimony that the privacy or the 2257 or the DMCA were, it was just a mistake that it's on the website? Is there any sworn testimony to that effect? I believe, your honor, that there was. I would have to go back and check specifically for a citation for that for you. I will also just say the website, another error, is that the website talks about it being an all-Chinese adult pornographic video sharing community website, and the world's first Chinese adult entertainment website. It's none of these videos. Another aspect though, your honor, about the 2257 language in particular, what 2257 does is it says that the website is affirming that all of the models appearing at the website are of legal age. Well, the plaintiff's claims have nothing to do with a question about whether or not models appearing on the website. But our question is purposeful direction at the forum of the website. Aren't we also required if there are disputed issues of fact to take essentially a summary judgment type of standard and resolve them in favor of the presented to the district court and that is in the record with respect to this issue, is that the language that is cited was mistakenly cited? But see, counsel, I don't see that anywhere, first of all. I don't see that something anywhere in the record where it says this was mistaken. But even if there were, wouldn't that be because it was here, it had this AV inserted in it in a just a mistake. Wouldn't that be something where we would be required to resolve the inferences in favor of the non-moving party? But again, I don't see anything in the record where anybody comes out and says this was a mistake. Well, your honor, with respect to the citations to U.S. law and as the district court noted in this case, and it was citing to both the Walnut case and the district court said is inclusion of language on a website that discusses United States law is certainly not dispositive towards the question of personal jurisdiction because all that it does is it shows an understanding that the website might be viewed by people from the United States, not that it was directly aimed at the United States. And clearly in a case such as this where 85% of the website's viewers are coming from Japan, from Taiwan, and if you add in some of the other surrounding Asian countries, you're up to 90% of the website's viewership. Anyone who puts anything on the internet knows that it could potentially be viewed in the United States, that's certainly true. But if that is in itself enough to establish jurisdiction, then every website is going to be subject to universal personal jurisdiction everywhere in the world where that website can be viewed. And I can see that I am out of time, your honors. All right, thank you, counsel. Mr. Freeman? Yes, briefly, thank you. One of the things that we know that is essentially undisputed is per year about 5 million U.S. viewers view this website. And we also know that geo-targeted ads are delivered to those users. So we know that the website is exploiting the U.S. market. There's no question about that. The citations about harm in the form of what counsel just said, if I can read from Bancroft versus Masters, it says, foreseeable harm element is satisfied when defendant's intentional acts has foreseeable effects in the forum. I don't think that it requires that the defendants understand that plaintiff may be harmed in the forum underneath that analysis. It's that their intentional act can have effects in the forum. And I think that that is for sure true here. And then there's also the harm in the forum, that aspect of the element about whether or not plaintiff could have been harmed in the forum. Here, Wilco earns over a billion dollars in U.S. copyrights, specifically targets the U.S. market. What's clear is that there's the potential diversion, the diversion of U.S. users and U.S. revenue from Wilco's potential clients by the existence and the operation and the display of this AV.com. May I ask a question? Why the Western District of Washington? Well, I guess we could choose. What connection, if any, does Wilco have with the Western District of Washington? There's really no connection versus any other district court, which is really the whole point of Rule 4K2. And candidly, it's because it's where my office is. Okay. As opposed to other, just to be candid, that's why. But there's no other connection really with any other district, which again is the... Did you look into the geographical distribution of the about 5 million viewers who actually watch your client's videos on this AV.com? Well, until we get into discovery, we don't have the ability to do that. And the way this was filed was we didn't know who owned and operated it. So we filed requests for early discovery, and that's when we determined who are named defendants now. But we never got into the that. And I see that I'm out of time. So thank you for this morning. Any further questions? No. Okay. Thank you, counsel. Wilco versus Lee will be submitted, and this session of the court is adjourned for today. Thank you. Thank you.
judges: WARDLAW, GOULD, BENNETT